## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| KAMARIA DOBOSU, | : | Case No. 3:15-cv-27 |
| | : | |
| Plaintiff, | : | District Judge Walter Herbert Rice |
| | : | |
| vs. | : | Chief Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATION[1]

This Social Security disability benefits appeal is before the Court on Plaintiff's statement of errors (Doc. 8), the Commissioner's memorandum in opposition (Doc. 10), Plaintiff's reply (Doc. 12), the administrative record (Doc. 6), and the record as a whole. At issue is whether the Administrative Law Judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore not entitled to disability insurance benefits ("DIB"), nor Supplemental Security Income ("SSI"). (*See* Doc. 6, PageID ## 78-97 (the "ALJ's decision")).

## I.  INTRODUCTION

Plaintiff Kamaria Dobosu protectively filed applications for DIB and SSI on June 29, 2011 and July 11, 2011, respectively, alleging disability beginning on January 1, 2008. (Doc. 8 at 1). Plaintiff stated she was unable to work due to bipolar disorder, back

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendation.

problems, sciatic nerve damage, and depression. (*Id.*) Her claim was denied initially and upon reconsideration. (*Id.*)

Plaintiff requested a hearing before an ALJ, which was held on June 26, 2013. (Doc. 6, PageID # 78). Plaintiff and a vocational expert ("VE") testified, with Plaintiff's counsel in attendance. (*Id.*)

On August 27, 2013, ALJ Elizabeth Motta issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Social Security Act, and was therefore not entitled to DIB or SSI. (*Id.* at 75). The ALJ found that Plaintiff had the residual functional capacity ("RFC")[2] to perform a reduced range of light work. (*Id.* at 88). Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that there were a significant number of jobs in the national economy that Plaintiff could perform. (*Id.* at 95). Therefore, the ALJ concluded that Plaintiff was not disabled. (*Id.* at 96).

The decision became final and appealable on November 28, 2014, when the Appeals Council denied Plaintiff's request for review. (*Id.* at 60-62). Plaintiff then properly commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Plaintiff was 34 years old. (Doc. 6, PageID # 95). She obtained her GED in 1998, but has not received any specialized job training, nor has she

---

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

attended any trade or vocational schools. (*Id.* at 350-51). The ALJ found that Plaintiff had past relevant work as a pawn broker, production assembler, pressure sealer and tester, and machine feeder. (*Id.* at 95). However, based on the VE's testimony, the ALJ determined that Plaintiff's limitations preclude her from returning to her past relevant work. (*Id.*)

The ALJ's "Findings," which represent the rationale of her decision, are as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since April 30, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lumbar spine disorder; fibromyalgia, including headaches; mild obesity; bilateral carpal tunnel syndrome; anxiety and depressive disorders; and a history of alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record … the claimant can do less than the Full Range of light work, ie, lift up to 20 pounds occasionally and 10 pounds frequently, but standing and walking is limited to combined total of four hours in an eight-hour workday. She can occasionally perform the postural activities of work, such as climbing stairs/ramps, balancing, stooping, kneeling, crouching or crawling, but cannot climb ropes, ladders or scaffolds, cannot tolerate exposure to hazards, such as moving or dangerous machinery or working at unprotected heights and she is limited to performing low

3

stress work, defined as work with no strict production quotas or fast pace and routine work with few changes in the work setting, and is limited to only occasional contact with the public, coworkers and supervisors, including no teamwork or over-the-shoulder supervision.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 23, 1978, and was 29 years old, which is defined as a younger individual, age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Doc. 6, PageID ## 80-96).  In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act and was therefore not entitled to DIB or SSI.  (*Id.* at 96).

On appeal, Plaintiff argues that: (1) the ALJ erred by failing to consider any manipulative limitations in Plaintiff's RFC despite recognizing severe bilateral cubital

4

tunnel syndrome; (2) the ALJ erred in rejecting the opinion of Plaintiff's treating physicians; and (3) the ALJ erred in finding that Plaintiff was not credible.  (Doc. 8).

## II.  STANDARD OF REVIEW

The Court's inquiry on appeal is limited to whether the ALJ's non-disability finding is supported by substantial evidence and whether the correct legal standard was applied.  42 U.S.C. § 405(g); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  Substantial evidence is more than a "mere scintilla" but less than a preponderance of the evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

In reviewing the ALJ's decision, the district court must look to the record as a whole and may not base its decision on one piece of evidence while disregarding all other relevant evidence.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  Even if the district court "might have reached a contrary conclusion of fact, the [ALJ's] decision must be affirmed so long as it is supported by substantial evidence." *Kyle*, 609 F.3d at 854-855 (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-05 (6th Cir. 2009)).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, she must present sufficient evidence to show that, during the relevant time period, she was unable to engage in substantial gainful activity by reason of any medically determinable physical or

mental impairment, or combination of impairments, which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A).

## III.  BACKGROUND

The relevant facts, as reflected in the record, are as follow:[3]

### A.  Relevant Medical Evidence

#### 1.  *Plaintiff's Medical Sources*

##### a.  Springfield Regional Medical Center

Plaintiff was diagnosed with cervical cancer and underwent a hysteroscopy and cervix excision in September 2009.  (Doc. 6, PageID ## 501-04).

On June 25, 2011, Plaintiff presented to the emergency room, complaining of acute low back pain.  (*Id*. at 642-45).  On examination, Plaintiff was found to have positive straight leg raising test, tenderness, decreased range of motion, and spasms.  (*Id*. at 643).  Lumber x-rays showed no fracture.  (*Id*. at 645).  Plaintiff was diagnosed with sciatica.  (*Id*. at 642).

##### b.  Yamini Teegala, M.D./Rocking Horse Community Health Center

Plaintiff began seeing primary care physician, Yamini Teegala, M.D., in June 2011.  (Doc. 6, PageID # 945).  Dr. Teegala saw Plaintiff for a mood disorder and complaints of back pain.  (*Id*.)  Plaintiff reported that she needed to restart her anti-

---

[3] Having thoroughly reviewed the administrative record, the Court finds that a detailed recitation of all facts in this case is unnecessary and, therefore, restricts its statement of the facts to those relevant to Plaintiff's alleged errors.

anxiety medication.  (*Id.*)  She was "extremely irritable and angry."  (*Id.*)  Dr. Teegala found Plaintiff to be "very sad, tearful, agitated, depressed."  (*Id.*)  Dr. Teegala prescribed medication for her mood disorder and chronic low back pain.  (*Id.*)

On June 23, 2011, Plaintiff received a Toradol injection for pain.  (*Id*. at 942). Due to Plaintiff's complaints of low back pain and left hip pain, Dr. Teegala ordered a lumbar spine MRI, which was taken on July 6, 2011 and showed a left paracentral/left lateral recess disc protrusion at L5-S1, abutting and posteriorly displacing the traversing left S1 nerve root.  (*Id*. at 640-41).  The radiologist noted this "is likely a means of irritation of the left S1 nerve root."  (*Id*.)  The MRI also showed marked lateral recess narrowing on the left without significant foraminal stenosis at L5-S1.  (*Id*.)  The MRI of Plaintiff's left hip was normal.  (Id. at PageID 638-39).

On July 15, 2011, an EMG revealed mild left L5-S1 radiculopathy.  (*Id*. at 636). On August 25, 2011, a thoracic spine x-ray showed mild dextroconvex scoliosis of the thoracic spine, with mild degenerative disc changes at the T3-T4 levels.  (*Id*. at 632).

### c.  Vadak Ranganathan, M.D.

On August 4, 2011, Plaintiff reported to neurologist, Vadak Ranganathan, M.D., that she suffered from two to four headaches a week, back pain that had worsened with time, and numbness in her hands.  (Doc. 6, PageID # 932).  Dr. Ranganathan noted more than twelve tender spots and suspected a diagnosis of fibromyalgia, tension vascular headaches, and lumbar strain and L5-S1 disc disease.  (*Id*.)  He also intended to rule out

carpal tunnel syndrome or cubital tunnel syndrome.  (*Id.*)  An EEG conducted on August

15, 2011, returned normal results.  (*Id.* at 979).

A brain MRI, taken on August 25, 2011, was normal.  (*Id*. at 986-87).  An EMG of

her upper extremities performed on January 4, 2012, showed bilateral moderate cubital

tunnel syndrome.  (*Id*. at 981-82).

Dr. Ranganathan completed interrogatories on May 30, 2013, during which he

opined that Plaintiff was unable to: be prompt and regular in attendance; withstand the

pressure of meeting normal standards of work productivity and work accuracy without

significant risk of physical or psychological decompensation or worsening of her physical

and mental impairments; demonstrate reliability; and complete a normal workday or

work week without interruption from psychologically and/or physically based symptoms

and perform at a consistent pace without unreasonable numbers and length of rest

periods.  (*Id*. at 1434-41).  According to Dr. Ranganathan, Plaintiff was unable to

lift/carry any weight, stand, walk, or sit during an eight hour work day; was never to

perform any postural activities; could not handle, finger, feel, or push/pull; and was

restricted from heights, moving machinery, chemicals, dust, noise, fumes, temperature

extremes, vibration, and humidity.  (*Id*. at 1437-40).  Dr. Ranganathan concluded that

Plaintiff could not perform even sedentary work.  (*Id*. at 1441).

Due to indications of displacement of the lumbar intervertral disc without

myelopathy, a lumbar spine MRI was taken on June 10, 2013, and revealed broad left

paracentral disc protrusion at L5-S1 contacting the right and defacing the left S1 nerve

roots.  (*Id.* at 1444).

        d.  <u>Vipul K. Patel, M.D.</u>

Plaintiff was seen by primary care physician, Vipul Patel, M.D., on September 15,

2011.  Dr.  Patel treated Plaintiff for anxiety, bipolar disorder, back pain, and headaches.

(Doc. 6, PageID ## 744-72).  Dr. Patel's clinical notes throughout 2011 and 2012 state

that Plaintiff was anxious, nervous, and depressed.  (*Id.* at 745-46, 750-51, 756).  On

physical examination, Plaintiff exhibited knee crackles and tender back.  (*Id.* at 762, 769).

By July 27, 2012, Dr. Patel discussed the side effects of Xanax and noted Plaintiff "has

lots of psychological stress" and he was "hesitantly" giving her medication.  He

recommended that Plaintiff see a psychologist or psychiatrist.  (*Id.* at 751).

On July 30, 2013, Dr. Patel completed interrogatories on behalf of Plaintiff.  (*Id.* at

1454-63).  Dr. Patel opined that Plaintiff has physical and mental impairments that would

interfere with her ability to do the following: be prompt and regular in attendance; to

respond appropriately to supervision, co-workers, and customary work pressures (due to

aggression); to withstand the pressure of meeting normal standards of work productivity

and work accuracy without significant risk of physical or psychological decompensation

or worsening of her physical and mental impairments; to sustain attention and

concentration on her work so as to meet normal standards of work productivity and work

accuracy.  (*Id.* at 1457-58).  Dr. Patel noted that Plaintiff can understand and remember

simple work instructions for short periods of time, but he was unsure whether she could carry out those instructions without supervision.  (*Id*. at 1458).

Further, Dr. Patel opined that Plaintiff was unable to: behave in an emotionally stable manner; relate predictability in social situations; demonstrate reliability; maintain concentration and attention for extended periods (approximately two hours at a time); perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal work day and work week without interruption from psychologically and/or physically symptoms and perform at a consistent pace without unreasonable numbers and length of rest periods; respond appropriately to changes in a routine work setting; get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; sustain an ordinary routing without special supervision; work in coordination with, or in proximity to, others without being unduly distracted by them; and accept instructions and respond appropriately to criticism from supervisors.  (*Id*. at 1459-62).  Dr. Patel concluded that Plaintiff had moderate restrictions in her daily activities, as well as marked difficulties in her social functioning and with concentration, persistence, or pace.  (*Id*. at 1462-63).

Dr. Patel also completed a physical assessment form in which he opined that Plaintiff was limited as follows: lift/carry no more than five pounds frequently; stand/walk for one hour and for only 30 minutes uninterrupted; sit for two to three hours out of eight and for half an hour uninterrupted.  (*Id*. at 1464-65).  Dr. Patel also opined that Plaintiff could occasionally climb and balance; never stoop, crouch, kneel, or crawl;

and was restricted from heights, moving machinery, chemicals, temperature extremes, vibration, dust, fumes, and humidity.  (*Id*. at 1466-67).  However, Dr. Patel opined that Plaintiff was not impacted with regard to the following abilities: seeing, hearing, speaking, reaching, handling, fingering, and feeling. He concluded that Plaintiff was unable to perform light work activity.  (*Id*. at 1468).

### e.  Kamel Abraham, M.D.

Plaintiff received bilateral facet injections for her low back pain in March and May, 2013.  (Doc. 6, PageID ## 1398-1402).

### f.  Mental Health Services for Clark County, Inc.

Plaintiff sought mental health treatment at Mental Health Services for Clark County, Inc. on July 12, 2006.  (Doc. 6, PageID ## 1360-66).  Plaintiff reported a history of working for only a few months, becoming bored, and then leaving the job.  She also had problems with sustaining relationships.  (*Id*. at 1361).  She has sought mental health treatment in the past but only for short durations.  (*Id*. at 1362).  Plaintiff next described her turbulent childhood, which included foster care, sexual abuse, living on the streets and pregnancy at fourteen.  (*Id*. at 1363).  The intake social worker found Plaintiff had very little insight and her judgment was mildly impaired.  (*Id*. at 1364).  Plaintiff was diagnosed with a mood disorder NOS; Rule out Bipolar I Disorder, mixed; Posttraumatic Stress Disorder; Rule out Attention Deficit Hyperactivity Disorder;  alcohol abuse; and Antisocial Personality Disorder.  (*Id*. at 1366).  Plaintiff was seen for four sessions

through October 2006.  (*Id*. at 1356).  She was discharged in 2007 for failure to continue treatment.  (*Id*. at 1356-58).

Plaintiff returned in August 2012 for a crisis assessment.  (*Id*. at 1395-96).  Her affect was described as dramatic and her speech was circumstantial, and was noted to have thought *content* impairment but her thought *process* was coherent.  (*Id*. at 1396).  Further, her motor energy was normal; she was oriented to person, time, place, and circumstances; her memory was intact; her insight was good; her judgment was good; At that time she was diagnosed with anxiety disorder NOS and mood disorder NOS.  (*Id*.)  Plaintiff continued to treatment at Mental Health Services for Clark County, Inc. through April 18, 2013.  (*Id*. at 1386-94).

### g.  Devinder Yakhmi, M.D.

Devinder Yakhmi, M.D., first saw Plaintiff on October 24, 2006.  (Doc. 6, PageID # 1371).  He noted she was depressed and had suicidal ideation.  (*Id*.)  Dr. Yakhmi diagnosed Plaintiff with depressive disorder NOS and rule out bipolar disorder.  (*Id*.)  Dr. Yakhmi continued to see Plaintiff through August 2009.  (*Id*. at 1367-70).

### h.  WellSpring

Plaintiff sought mental health treatment at Wellspring on January 22, 2013.  (Doc. 6, PageID # 1423).  She reported mood swings and having problems tolerating other people.  (*Id*.)  On mental status examination, Plaintiff was found to be hyperactive, verbose, and guarded.  (*Id*.)  Her affect was variable and dramatic and her mood was angry.  She had limited insight and judgment.  (*Id*. at 1429).  The social worker who

completed the evaluation noted diagnostic impressions of Post-Traumatic Stress Disorder, and bipolar I disorder by history.  (*Id*. at 1432).  Individual counseling was recommended to reduce anxiety and help to reduce the impact of trauma on current functioning.  (*Id*. at 1433).

Plaintiff continued to attend counseling at WellSpring though May 2013.  (*Id*. at 1403-22).  The progress notes show Plaintiff made progress and continued to report a reduction in anxiety.  (*Id*.)

### 2. *Consultative Sources*

#### a. Rohn Kennington, M.D.

Plaintiff was examined by consulting physician, Rohn Kennington, M.D., at the request of the Bureau of Disability Determination ("BDD") on October 13, 2011.  (Doc. 6, PageID ## 472-78).  Plaintiff reported she could not work due to mental illness issues and chronic low back pain.  (*Id*. at 472).  Plaintiff reported she has constant discomfort in her lower back with radiation to the hips and sometimes down her left leg, made worse with activity and prolonged standing/walking or weather change, for which she takes over-the-counter pain medication.  (*Id*.)  Dr. Kennington found tenderness to palpation, an antalgic gait, reduced lumbar flexion by ten degrees, but all other ranges of motion were normal.  (*Id*. at 473).  Muscle strength, reflexes, and sensation were all normal and straight leg raise testing was negative.  (*Id*. at 475-79).

Dr. Kennington diagnosed chronic low back pain with sciatica and cervical dysplasia by history.  (*Id*. at 474).  He concluded that moderate or heavy lifting, carrying,

13

pushing, or pulling would be precluded, but Plaintiff could perform light lifting, carrying, pushing, and pulling; sitting, standing, and walking was limited to one hour at a time with adequate periods of time for rest and change of position in light of her chronic low back pain and her sciatica; and handling objects, hearing, speaking, and traveling would be unaffected.  (*Id*.)

### b.  Elizabeth Das, M.D./Teresita Cruz, M.D.

On October 28, 2011, BDD physician, Elizabeth Das, M.D., reviewed the medical evidence and completed an evaluation regarding Plaintiff's physical impairments.  (Doc. 6, PageID ## 151-52).  Specifically, Dr. Das opined that Plaintiff could lift/carry fifty pounds occasionally and twenty five pounds frequently.  She could stand/walk for six hours out of eight and sit for six hours out of eight.  (*Id*. at 151-52).  Dr. Das opined that Dr. Kennington's assessment is given other weight because the opined limitations are not supported by the objective evidence in file.  (*Id*. at 151).  Dr. Das also found Plaintiff was only partially credible explaining that "[c]areful consideration has been given to the claimant's statements regarding alleged symptoms and their effect on functioning.  (*Id*.) The claimant's MDI (s) could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence."  (*Id*.)

On June 5, 2012, BDD physician, Dr. Cruz reviewed the medical evidence upon reconsideration and affirmed Dr. Das's assessment.  (*Id*. at 195-96).

14

c.  Daniel Hrinko, Psy.D.

On April 2, 2008, Plaintiff was evaluated by Daniel Hrinko, Psy.D., at the request of the BDD.  (Doc. 6, PageID ## 436-39).  Plaintiff described her turbulent childhood that involved multiple episodes of abuse and neglect.  (*Id*. at 438).  Dr. Hrinko stated that:

> As a child, [Plaintiff] failed to learn many reasonable and appropriate relationship skills and has developed assumptions about others that make it difficult for her to engage in honest, open, and emotionally supportive relationships.  These limited relationship skills contribute to her being overly sensitive and overreacting to minor disagreements in the job place which result in conflicts and inappropriate behaviors leading to her termination from jobs.

(*Id*.)

Dr. Hrinko diagnosed Plaintiff with bipolar disorder, mixed and moderate; generalized anxiety disorder; and polysubstance dependence in partial remission.  (*Id*. at 439).  Dr. Hrinko opined that Plaintiff's ability to relate to supervisors and co-workers was moderately impaired and that her ability to deal with work stress was mildly impaired.  (*Id*.)  Further, he opined that Plaintiff showed no impairment in her ability to: understand and follow instructions, based on memory skills; and maintain attention to perform simple and repetitive tasks.  (*Id*.)

d.  George Schulz, Ph.D.

On August 24, 2011, at the request of the BDD, George Schulz, Pd.D., examined Plaintiff and prepared a psychological evaluation.  (Doc. 6, PageID ## 459-67).

Plaintiff reported a turbulent childhood.  (*Id*. at 460).  As to her daily activities, Plaintiff reported she cleaned her house and watched television.  (*Id*. at 462).  She

15

shopped, prepared meals, did laundry, and used a computer.  (*Id*. at 462-63).  Dr. Schulz found Plaintiff's abstract reasoning ability was in the borderline range.  (*Id*. at 464).  He diagnosed Plaintiff with bipolar disorder, NOS.  (*Id*. at 465).

According to Dr. Schutz, Plaintiff was "expected to be able to understand and apply instructions in the work setting within the low average range of intellectual functioning."  (*Id*. at 466).  He also opined that Plaintiff "is capable of completing routine or repetitive tasks both at home and in the community or on a job setting."  (*Id*.)  Plaintiff reported to Dr. Schulz that she has no problems getting along with co-workers but has significant problem with bosses.  (*Id*.)  Plaintiff attributed her poor relationship with supervisors to her "smart mouth" and "trouble with authority figures."  (*Id*.)  Dr. Schulz concluded that Plaintiff was likely to have difficulties responding to supervisors and co-workers, and was likely to have some difficulties responding to work pressures.  (*Id*. at 466-67).

### e.  Lari Meyer, Ph.D.

On July 10, 2012, at the request of the BDD, Lari Meyer, Ph.D., examined Plaintiff and prepared a psychological evaluation.  (Doc. 6, PageID ## 717-27).

As to her activities of daily living, Plaintiff reported that she got up early in the morning, spent time playing with her children, cooked, spent much of her time in her bed, and then went to bed at 9 or 10.  (*Id*. at 722).

On mental status examination, Dr. Meyer noted that Plaintiff was labile, avoided eye contact and kept her head down.  (*Id*. at 723).  She exhibited no motoric or autonomic

signs of anxiety.  Plaintiff related that she experienced some hallucinations and some paranoid ideation.  (*Id*. at 724).  Her judgment and insight were fair. She was considered a reliable historian.  (*Id*. at 725).  She was oriented times three and conversation was flowing, relevant, coherent, and goal-directed with no unusual or tangential/circumstantial thinking, and her associations were normal.  She repeated five digits forward and three in reverse, recalled three of three objects immediately and recalled one of three objects after five minutes.  (*Id*.)

Dr. Meyer diagnosed Plaintiff with a mood disorder NOS and anxiety disorder NOS.  (*Id*. at 727).  Dr. Meyer opined that Plaintiff could understand, remember, and carry out basic tasks.  She could maintain attention and concentration for simple tasks. She would have a labile mood and affect when relating to others.  She would have unpredictable anger outbursts.  She could perform only low stress work in which she worked alone.  (*Id*. at 727-28).

### f.  David Demuth, M.D./Carl Tishler, Ph.D.

Non-examining state agency psychiatrist, David Demuth, M.D., conducted an initial review of the record on September 9, 2011, at the request of the BDD.  (Doc. 6, PageID ## 145-54).  Dr. Demuth determined that Plaintiff had moderate restrictions in activities of daily living, moderate limitations maintaining social functioning and in maintaining concentration, persistence or pace; with no episodes of decompensation.  (*Id*. at 150).  Dr. Demuth gave "great weight" to Dr. Schulz's opinion, finding that it was supported by objective evidence.  (*Id*. at 151).  He found, "She is likely to have

difficulties in responding to coworkers and supervisors in a work setting … [and] would do best in a well-spaced work environment with infrequent and superficial interaction with others." (*Id*. at 153). Dr. Demuth also found that Plaintiff "will likely have difficulties responding to changes in the workplace due to her bipolar symptoms, but she could adapt to a work setting without frequent changes." (*Id*. at 154).

On July 31, 2012, BDD psychologist, Carl Tishler, Ph.D., reviewed the medical evidence upon reconsideration and affirmed Dr. Demuth's assessment. (*Id*. at 176-82).

**B. The Administrative Hearing**

*1. Plaintiff's Testimony*

Plaintiff testified that she lived with her youngest child, age 7 and her 14 year old daughter. (Doc. 6, PageID # 111). Plaintiff obtained her driver's license the year of the hearing and sometimes drove if she borrowed a car. (*Id*. at 112-13). She obtained her GED and attended Clark State Community College in 2010. (*Id*. at 113).

At the time of the hearing, Plaintiff testified she was not receiving treatment for her carpal or cubital tunnel syndrome. (*Id*. at 120).

She testified that her fourteen year old daughter helped her with the household chores and was "very helpful" to Plaintiff. (*Id*. at 125). Plaintiff testified that she sometimes cooked or used convenience food. Her daughter cooked when she could not do so. She did dishes alternating standing and sitting. Plaintiff spent a great deal of time lying down. Her daughter vacuumed and mopped. (*Id*. at 125). She had someone else do the yard work. (*Id*. at 126). She stayed mostly at home and did not go to church,

18

meetings, clubs, and visit others. (*Id*. at PageID 127). She had an affair but the man visited her. (*Id*. at 129). She used a computer to talk to her husband. (*Id*. at 130). She watched television and read sometimes. She tried to sew sometimes. (*Id*. at 131).

### 2. *The VE's Testimony*

Vocational expert, William Braunig, responded to hypotheticals posed by both the ALJ and Plaintiff's counsel. (Doc. 6, PageID ## 133-40). In response to Plaintiff's counsel's inquiries, the VE testified that even if Plaintiff required breaks every hour, in order to allow her to change her position and rest for an "adequate" period of time, she would still be able to sustain employment. (*Id*. at 139).

### C. The ALJ's Decision

The ALJ accorded significant weight to BDD reviewing physicians, Drs. Demuth and Tishler, and the psychological consultants Drs. Schulz and Meyers. (Doc. 6, PageID # 92). Additionally, the ALJ gave significant weight to Dr. Kennington's opinion, in large part. (*Id*. at 94).

## IV. ANALYSIS

### A. The ALJ's RFC Determination

Plaintiff asserts that the ALJ "erred by failing to consider any manipulative limitations in Plaintiff's [RFC] despite recognizing severe bilateral cubital tunnel syndrome." (Doc. 8 at 11). Plaintiff argues the ALJ erred in relying on Dr. Kennington's October 13, 2011 finding of normal upper extremity function, as that examination took place prior to the January 4, 2012 EMG, which revealed bilateral moderate cubital tunnel

syndrome.  (*Id.*)  Accordingly, Plaintiff states that Dr. Kennington's opinion cannot serve as substantial evidence that her upper extremity impairment did not require additional work related restrictions.  (*Id.*)

Here, the ALJ's RFC determination explains that "given the [claimant's] cubital tunnel syndrome, all climbing requiring the upper extremities should be precluded. However, given the normal upper extremity function documented by Dr. Kennington, further restrictions regarding the upper extremities are not supported by the evidentiary record."  (Doc. 6, PageID # 90).[4]  However, *prior to making this determination*, the ALJ first acknowledged the January 4, 2012 EMG results, but noted that "physical examinations consistently revealed normal reflexes, sensation, and muscle strength, as well as coordination and gait (Exhibits 10-F, 41-F, and 51-F)."  (*Id.* at 81).  Moreover, the ALJ elaborated, with specific emphasis on Plaintiff's cubital tunnel syndrome, that:

> The record contains an upper extremity EMG, performed on January 4, 2012, that was consistent with a moderate bilateral cubital tunnel syndrome (Exhibit 10-F at 10 and 11).  However, upper extremity remains unimpaired based on the evaluation of Dr. Kennington noting normal upper extremity function and grip strength and the treatment notes of Dr. Ranganathan, which do not document observation or complaint of significant upper extremity impairment. As a result, the record documents only relatively mild objective findings with minimal clinical correlation and no evidence of nerve root compression documented on clinical examinations.

(*Id.* at 89).

---

[4] The RFC determination is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(2), (3).

As shown above, the ALJ acknowledged the EMG findings, and then properly looked to the record to determine what physical limitations were imposed by that particular impairment.  In doing so, the ALJ determined that the examination and treatment notes from two medical sources – including Dr. Ranganathan, the physician signed off on the EMG findings – evidence that Plaintiff is not physically restricted despite the EMG results.  (*Id.* at 89, 590-594, 599-600, 1222-1226, 1384-1385).

Thus, the ALJ's RFC determination appropriately focused on the evidence of Plaintiff's functional limitations rather than the mere diagnosis of an impairment.  *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x. 547, 551 (6th Cir. 2014) ("disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it").  The ALJ's decision declining to impose additional RFC limitations based upon Plaintiff's cubital tunnel syndrome is therefore not erroneous and should be affirmed.

**B.  The ALJ's Assessment of Treating Source Opinions**

Plaintiff argues that the ALJ erred in rejecting the opinion of Plaintiff's treating physicians, Drs. Patel and Ranganathan, and relying instead on the opinions of consultative evaluators, Drs. Schulz and Meyer.  (Doc. 8 at 11-18).

"Regardless of its source, [an ALJ must] evaluate every medical opinion," in order to determine whether a claimant is disabled.  20 C.F.R. § 404.1527(b), (c).  However, "not all medical sources need be treated equally."  *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (internal quotation marks and citations omitted).  The Regulations require that a treating doctor's opinion be given "controlling weight" as long

21

as it is "well-supported" by objective evidence and is "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Treating source opinions are generally given greater weight because treating physicians are more likely "to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* Less weight is given to non-treating and, certainly, non-examining sources. *Id*.

"On the other hand … '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

If, upon consideration of the § 404.1527(c) factors, the ALJ rejects the opinion of a treating physician, she must articulate "good reasons" for doing so. *Wilson*, 378 F.3d at 544. "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases … [but] also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* at 544-45 (internal quotation marks and citations omitted). In particular, the ALJ's decision must articulate the "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Notably, the ALJ's duty to properly articulate 'good reasons' is so significant that, "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Here, the ALJ determined that "both Dr. Ranganathan's and Dr. Patel's opinions [were] entitled to minimal, if any, adjudicative weight." (Doc. 6, PageID # 93). The ALJ explained that while "Dr. Ranganathan's assessment essentially limits [Plaintiff] to full-time bed rest," the record reflects that his own treatment notes, as well as other objective and clinical evidence, do not support such extreme limitations. (*Id.* at 93-94). By way of

23

example, the ALJ states that "EMG testing in May of 212 confirmed no electrodiagnostic evidence of radiculopathy and clinical examinations consistently showed normal reflexes, sensations, and motor functions." (*Id.* at 93).

Similarly, the ALJ explains that "Dr. Patel provides no reasonable explanation for his limitations beyond stating that the claimant experiences tenderness in her back and has other medical conditions that affect her functional ability." (*Id.* at 94). Specifically, she states that Dr. Patel's opinion indicates Plaintiff is severely limited, particularly in her ability to lift, stand, and walk, but his "treatment notes document no objective or clinical findings that support such drastic restrictions in the claimant's ability to sustain work activity." (*Id.*) In support, the ALJ points to the relatively normal results of Plaintiff's MRI and EMG tests, and states that "[o]bjective and clinical findings document some essentially mild functional restrictions, but do not document radiculopathy or other significant findings." (*Id.*) Moreover, the ALJ notes that, while Dr. Patel indicates the existence of significant functional restrictions due to back pain, anxiety, headaches, and bipolar disorder, "Dr. Patel is an internal medicine physician, not a specialist in either psychiatry or orthopedic medicine." (*Id.*)

As to psychological impairments, the ALJ found that "the opinions of Dr. Schulz and Dr. Meyer are entitled to significant weight because they are consistent with the weight of the medical evidence." (*Id*. at 92). Further, as to Plaintiff's physical impairments, the ALJ rejected the opinions of the State Agency medical consultants, finding that Plaintiff "is significantly more limited from a physical standpoint than set

24

forth by those consultants." (*Id*.) Instead, the ALJ relied largely on Dr. Kennington's opinion as to Plaintiff's physical limitations. (*Id*. at 94). The ALJ did note, however, that "while [Dr. Kennington's] opinion limiting the claimant to the general requirement of light work is generally supported, his statement concerning adequate rest is entitled to limited weight." (*Id*.) Specifically, the ALJ pointed out that there was no evidence in the record demonstrating that Plaintiff would require unscheduled rest breaks after only one hour of sitting, standing or walking, and that Dr. Kennington "made no effort to explain his definition of *adequate* rest." (*Id*.) (Emphasis added). Regardless, the ALJ stated that any documented limitations as to Plaintiff's ability to stand, sit, and walk, are accounted for by the RFC restrictions (*i.e.*, standing and walking for a total of four hours throughout an eight-hour workday, with standing and sitting largely at the employee's discretion). (*Id*.)

It bears repeating that this Court's "review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013). An ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even if the ALJ's ultimate finding may be justified by the record. *Id*. However, "[a] reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, <u>even if substantial evidence would also have supported the opposite conclusion</u>." *Id*. (citing *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)) (emphasis added).

Having reviewed the ALJ's decision and the record, in line with the standard applicable on review, this Court finds no error in the ALJ's assessment of the medical evidence.  Specifically, the ALJ adhered to the SSA's rules and regulations in weighing the medical opinions, including the more detailed reason-giving requirements applicable to treating sources.  Substantial evidence supports the ALJ's determination that the treating source opinions were internally inconsistent and that the drastic limitations opined therein are unsupported by the objective and clinical findings in the record.  Substantial evidence also supports the ALJ's determination that the opinions of the consultative evaluators and examiner are entitled to greater weight.  Accordingly, the ALJ's assessment of the medical source opinions should be affirmed.

Plaintiff also asserts that "the ALJ substitute[d] her medical opinion for that of any medical doctor … [and] fail[s] to rely on any medical opinion in finding that [Plaintiff] is not disabled by her physical impairments."  (Doc. 8 at 15).  Specifically, Plaintiff points to the ALJ's brief discussion regarding how Plaintiff's "[self-]reported sedentary or lethargic lifestyle is undoubtedly one of the worst things she could do for her fibromyalgia condition."  (*Id.*)  However, Plaintiff's characterization is unavailing when the statement at issue is fully read in context.  (*See* Doc. 6, PageID ## 91-92).  Indeed, a contextual reading shows that the ALJ, having just determined that Plaintiff's allegedly limited daily activities could not be attributed solely to her medical impairments, was merely trying to explain that *even if* 'deconditioning' were the reason for Plaintiff's

26

"sedentary or lethargic lifestyle," the SSA's Rulings would actually preclude functional restrictions on that basis. (*Id.*)

Finally, Plaintiff argues that the ALJ erred in relying on Global Assessment of Functioning ("GAF") scores to find that Plaintiff is not disabled by her mental impairments.[5] (Doc. 8 at 16).

"A GAF score is a subjective rating of an individual's overall psychological functioning, which may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, --- F.3d ----, 2016 WL 362423, at *7 (6th Cir. Jan. 29, 2016) (internal quotation marks and citations omitted). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Indeed, "GAF scores are 'not raw medical data,' and 'the Commissioner has declined to endorse the [GAF] score for use in' Social Security benefits programs." *Miller*, 2016 WL 362423, at *7 (quoting *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 716 (6th Cir. 2013). "If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant [because her] GAF score is [] low." *Kornecky v. Comm'r of Soc.*

---

[5] A GAF score is used to report a clinician's judgment as to a patient's overall level of psychological, social, and occupational functioning. DSM-IV-TR Classification Appendix, available at: http://wps.prenhall.com/wps/media/objects/219/225111/CD_DSMIV.pdf. The GAF scale ranges from 0 to 100, divided into ten-point increments, with a lower score indicating greater symptom severity and difficulty functioning. *Id.*

*Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). Ultimately, the value of a claimant's GAF score must be determined on a case-by-case basis. *Miller*, 2016 WL 362423, at *7.

Here, contrary to Plaintiff's assertion, the ALJ did not erroneously <u>rely</u> on Plaintiff's GAF scores to determine that she is not disabled by her mental impairments. Indeed, beyond merely noting the GAF scores assigned by Plaintiff's own medical sources and explaining the scores corresponding indication as set forth in the DSM-IV, the ALJ does not appear to *rely* on the GAF score at all. (Doc. 6, PageID ## 84-86). Notably, a GAF score is not necessarily an impermissible consideration. *See Miller*, 2016 WL 362423, at *7. However, here, the ALJ's acknowledgment of the GAF scores was simply an inclusion in her summary of the record evidence rather than a driving force behind her non-disability determination. Accordingly, Plaintiff's argument that the ALJ impermissibly relied on the GAF scores is unavailing.

In sum, the ALJ did not err in weighing medical source opinions and substantial evidence supports her findings.

### C. The ALJ's Credibility Determination

Finally, Plaintiff alleges that the ALJ erred in finding her allegations of pain 'not credible.' (Doc. 8 at 18-21) Further, Plaintiff argues that the ALJ erred by relying on a "misinterpretation" of Plaintiff's daily activities to find that she is not credible and, thus, could perform work activities. (*Id.*)

In making a determination of disability, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider [the claimant's] credibility."

28

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). However, subjective complaints may "support a claim for disability, <u>if there is also objective medical evidence</u> of an underlying medical condition in the record." *Id.* at 475-76 (emphasis added).

The Court must "accord the ALJ's determination of credibility great weight and deference particularly since the ALJ has the opportunity … of observing [the claimant's] demeanor while testifying." *Id.* However, to appropriately evaluate the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *1 (July 2, 1996).

The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight … [given] to the individual's statements and the reasons for that weight." *Id.*, at *2. Indeed, "'[i]t is more than merely 'helpful' for the ALJ to articulate reasons ... for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.'" *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (quoting *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

29

"One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p, at *5.  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted). However, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, at *1.

Here, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (Doc. 6, PageID #89).  Further, the ALJ appropriately looked to the regulatory factors for assessing symptoms, such as pain, pursuant to 20 C.F.R. § 404.1529.  (*Id*. at 91).

Specifically, the ALJ found, as to physical impairments, that the objective and clinical findings do not support the degree of pain and functional limitation Plaintiff reports.  (*Id*. at 89).  The ALJ then thoroughly articulated the basis for her assessment by pointing to specific objective evidence, which evidence undermined Plaintiff's allegations.  (*Id*. at 89-90).  Moreover, as to mental impairments, the ALJ assessed the degree to which her Plaintiff's allegations were supported by the medical evidence and appropriately accommodated Plaintiff's difficulties relating to others and her stress induced by frequent or sustained interaction.  (*Id*. at 90).  However, the ALJ noted that:

30

> [A]lthough the claimant has a history of difficult personal interaction in past work activity, her presentation to Dr. Schulz and Dr. Meyers, as well as the treatment notes of Dr. Patel, Clark County, and WellSpring do not indicate an inability to relate to others on at least a superficial basis. Further, she maintains a stable relationship with her children, maintains contact with her husband, recently had an affair, and reported improved symptoms and better coping ability to her counselor at WellSpring (see, Exhibit 54-F).

(*Id.*)

Further, the ALJ noted that Plaintiff's reports to her treating sources had been somewhat inconsistent.  (*Id.* at 91).  For example, the ALJ points out that Plaintiff's claims regarding her marital status and living arrangements have varied inexplicably. (*Id.*)  Additionally, the ALJ observed that Plaintiff's testimony regarding the side effects of her medication (*i.e.*, drowsiness) were inconsistent with the medical evidence, as she had never reported the problem to any of her physicians.  (*Id.*)  Also, the ALJ noted that Plaintiff's claims as to when she first sought treatment for pain management are inconsistent with the medical records.  (*Id.*)  Finally, as called for pursuant to the Regulation, the ALJ considered Plaintiff's daily activities.  (*Id.*)

Plaintiff's argument that the ALJ erroneously relied on a misinterpretation of daily activities is without merit.  The "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting <u>on a regular and continuing basis</u>."  Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *1 (emphasis added).  The term "'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id*.  Notably, minimal daily functions (*e.g.*, driving, reading,

cleaning, watching television, *etc.*) are not comparable to typical work activities.  *See, e.g., Rogers,* 486 F.3d at 248-49.  However, with that said, daily activities *are* an appropriate consideration to show that a claimant's symptoms are not as limiting as alleged.  20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(2)(i); *see Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (an ALJ may "consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments").

With regard to Plaintiff's daily activities, the ALJ stated that:

[Plaintiff] is the sole caregiver for four children, ages 6 through 17.  She testified that she does household chores, limited only by her physical impairments.  She is able to drive and go grocery shopping.  She uses a computer and social network, including Facebook to keep in touch with her husband.  She maintains appropriate hygiene and grooming.  She complained primarily of difficulty performing the physical requirements of working and taking care of her household, stating that she felt she like she was "in a 60-year-old" body.  She advised Dr. Schulz that she cleaned the house and did laundry, prepared meals using a stove and microwave, and did the grocery shopping.  She also reported using a computer, e-mail, search engines to do research on the internet, and using social networking.  She also reported that she regularly listened to the radio. In early 2013, she advised her social worker that she sewed, crocheted, cooked, enjoyed movies, and was having an affair (See, Exhibit 54-Fat 22 and 24).  Accordingly, the record does not support finding more than a mild restriction in daily activities due to her alleged mental impairments.

(Doc. 6, PageID # 86).  Subsequently, the ALJ also noted that "[p]rior to an incident involving her youngest child in 2010, she was attending Clark State Community College."  (*Id.* at 91).

In short, the ALJ did not rely on Plaintiff's statements regarding her daily activities as substantial evidence that Plaintiff is not disabled.  Instead, the ALJ considered Plaintiff's admitted daily activities in determining the credibility of her allegations of severity and her physicians' opinions regarding physical limitations.  In doing so, the ALJ found that the level of severity Plaintiff alleged was inconsistent with her daily activities, which she herself reported to various sources over time.  Such consideration of daily activities for purposes of evaluating symptoms is appropriate and, accordingly, the ALJ did not err in her assessment.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(2)(i).

Accordingly, this Court finds no error in the ALJ's credibility determination.

## V.  CONCLUSION

Based upon the foregoing, the Court believes that there is substantial evidence supporting the ALJ's findings at each step of the sequential evaluation, including her ultimate decision that Plaintiff was not disabled under the Act.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be AFFIRMED;

2.  The case be terminated on the docket of this Court.

Date:  2/16/2016                                    *s/ Sharon L. Ovington*

                                                                Sharon L. Ovington
                                                                Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).